**GOOD v. GREEN et al.**

No. 510.

United States District Court
W. D. Missouri, W. D.

April 14, 1950.

Alfred D. Hillman, George B. Reinhardt, Kansas City, Mo., for plaintiff.

Roy K. Dietrich, Edwin Earnshaw, Gossett, Ellis, Dietrich & Tyler, Kansas City, Mo., and Donald C. Earnshaw, Lee's Summit, Mo., for defendants.

REEVES, Chief Judge.

In this action both parties allege the breach of a contract between them. Each claims damages alleged to have accrued against the other. The principal issue at the trial aside from the alleged breaches was whether the defendants attempted by parol evidence to vary the terms of a written contract. The verbiage of their contract and the earnest controversy waged between the parties make it necessary to set out the contract verbatim:

"Good Grain Company No. ——
R. C. Good, owner
Phone 30
Glenwood, Iowa, Nov–25–1947

The Old Mill
Lees Summitt Mo

We are pleased to confirm sale to you today by —— of Ten thousand bushels of No 2 yellow shell corn at $2.75 per bushel to be crib sorted and not over 15½ moisture (Two and 75/100) per bushel ——
at Good Grain Co. Elevator ......shipment as follows: Purchaser to begin trucking corn on Jan 1–1948 and continue until all is taken unless roads are in a condition that corn cannot be delivered to elevator.

Good Grain Company
The Old Mill
by W. M. Green, Jr."

By R. C. Good

Pursuant to the execution of said contract the parties negotiated and conferred frequently about carrying out the terms of the contract. Such negotiations and conferences continued until some time in March, 1948, when the defendants definitely and unequivocally refused to proceed further under the contract. It was their contention that the plaintiff had been unable to comply with the contract whereas the plaintiff on his part asserted his preparedness at all times to make deliveries under the contract. As an incident to the main controversy and at approximately the same date that the defendants finally rejected the contract they, the defendants, purchased 448 bushels and 12 pounds of yellow corn from the plaintiff at an agreed price of $2.50 per bushel. When delivery was made, a check in the sum of $1,120.53 was given by the defendants in payment. Payment was stopped on the check by the defendants and protest fees in the sum of $2.50 accrued, making a total of $1,123.03. Apparently the object of this purchase was the collection of a One Thousand Dollar deposit made by the defendants on the original contract as earnest money. The defendants, however, placed the stop payment order upon the ground that the corn thus delivered did not come up to specifications. In addition to the action for an alleged breach of the contract the plaintiff also sues for the amount of this check with protest fees and he demands interest at 6% from the 16th day of March, 1948, the date the check was given and the delivery of the load of corn was made. It is admitted that the defendants had deposited One Thousand Dollars with the plaintiff as a token payment at the time the original contract was signed.

The evidence in the case showed that the plaintiff was engaged in the grain business at Glenwood, Iowa, that he operated several elevators at different points, and that he produced corn for sale as well as engaging in the purchase and sale of corn. The defendants were engaged, among other things, in processing seed corn, and had been so engaged for several years. Both the parties understood that the corn covered by the contract of November 25th was to be processed for seed and to be sold to the customers of the defendants. Such an understanding, however, was not incorporated in the contract and it was the contention of counsel for plaintiff that the contract provided for the sale of the usual No. 2 Yellow Corn at the then-market price. On the other hand the defendants contend that it was understood by all parties that the corn thus purchased was for the particular object mentioned, and that it was to be new corn, that is to say, corn produced in the year 1947 in contradistinction to old

corn or corn produced in the year 1946. The defendants claim that new corn is superior for germinating purposes to old corn or second year corn. On this point, however, there was evidence on the part of the plaintiff tending to show that old corn was just as good, and that the defendants had, after an inspection, contracted to purchase a crib of corn containing 3500 bushels of new corn and 7000 bushels of old corn, that is to say that the 10,000 bushels under the contract were to be taken from this crib; whereas the defendants said that the crib in question was filled with new corn and that its contents aggregated from 14,000 to 15,000 bushels and that it was understood delivery was to be made from the corn thus stored.

While plaintiff testified that he was ready at all times to make delivery in compliance with the specifications of the contract, the evidence showed that as late as March 10, 1948, the moisture content was above the maximum fixed in the contract, namely 15½%. Early in January, and even through February, and up until the first of March, the defendants had asked for delivery in accordance with the terms of the contract. The defendants toward the middle of March repudiated or rejected the contract. When suit was filed by the plaintiff for the alleged breach of the contract, the defendants countered with a counterclaim for an alleged breach on the part of the plaintiff and they, too, claim damages. Moreover, they claim damages for the load of corn above mentioned as having been purchased on March 16, 1948.

Other facts will be stated as they may become pertinent in the course of this memorandum opinion.

1. The contract called for "Ten thousand bushels of No 2 yellow shell corn * * * to be crib sorted and not over 15½ moisture * * *." Delivery was to be made at $2.75 per bushel at the Good Grain Company elevator operated by the plaintiff near Glenwood, Iowa. No issue, however, is made as to the point of delivery. It is obvious that the parties had in mind a special use for the corn purchased where it was specified it should be "No 2 Yellow shell corn * * * to be

crib sorted" and containing not over 15½% moisture. The preponderance of the testimony showed that old corn, that is corn produced the previous year, would have even a lower moisture content than 15½%. It seems obvious, therefore, that the parties contemplated new corn when the contract was written. Moreover, both sides said that the corn covered by the contract was to be taken from the crib containing 10,500 bushels according to the plaintiff, and 14,000 to 15,000 bushels according to the defendants. Even the plaintiff said that the 3500 bushels in this crib to be sold to the defendants was new corn. The contract provided that delivery was to be made, or to use the language of the contract, "purchaser to begin trucking corn on Jan 1-1948 and continue until all is taken * * *." This was followed by a provision beneficial to the plaintiff, "unless roads are in a condition that corn cannot be delivered to elevator."

During the negotiations for delivery it was not once claimed by the plaintiff that the roads were not in condition for delivery to the elevator. On the contrary, by letter dated January 2, 1948, from J. T. Connor, an agent for Good Grain Company, to the defendants, the following language is apposite:

"Dear Mr. Greene:

I am writing to ask that you allow us a few days notice before you are ready to start hauling.

Mr. Good Said to tell you that he still thinks that the old corn is your best bet. If you are interested in more corn than you have purchased please let us know at once as our stocks are getting smaller all the time.

Yours truly
(S)J. T. Connor
Good Grain Co."

And, then, on March 10, 1948, although the letter was dated February 10, 1948, but mailed by registered letter on the former date, the plaintiff advised defendants: "In regard to the corn sold you we have had only a couple days since you were here that corn could be delivered from the country. I had part of the old corn in the

East crib delivered to the elevator and we put in the ventilators where the old corn was. We moved the new corn over the ventilators so we can use the blower and get some air through the corn. It should not take long for after moving the corn we find it only contains 16 to 16.3% moisture and a few warm windy days would put it under 15½% without moving the balance of the corn. * * *"

It will be thus seen that, even at that date, the corn was not ready for delivery although the contract provided for deliveries to begin on January 1, 1948. Plaintiff, in his negotiations and conferences with the defendants, had never urged that delivery was prevented by bad roads. While the evidence of the plaintiff tended to show that the winter had been bad and that the roads were difficult of passage, the defendants produced contrary proof. There was no proof that the roads were in such condition that the corn could not have been delivered to the grain elevator as stipulated in the contract. But, even so, the corn had not been prepared for delivery by reducing the moisture content so as to comply with the terms of the contract. Undoubtedly the plaintiff was conversant with the situation of defendants and the importance of making deliveries in time for appropriate processing and preparation for the spring seeding. It is difficult to see upon what legal grounds the plaintiff delayed delivery and especially in view of the fact that the contract price was far above the current market price at the time he had agreed to make delivery.

■ 2. The contention of able counsel for the plaintiff was that much of the testimony fell under the ban of the parol or extrinsic evidence rule affecting contracts. The rule relates to instruments of a contractual nature which are "valid, complete, unambiguous, and unaffected by accident or mistake." 32 C.J.S., Evidence, § 851, p. 784.

■ Undoubtedly the contract in question was a valid one and was unambiguous. It provided for the delivery of No. 2 Yellow shell corn, and not such as would be sold in the public market place but crib sorted and with a moisture content not above 15½%. These special provisions were put in the contract because of the special use to which the corn was to be dedicated or employed and all parties know what this use was.

In receiving testimony that the corn was to be the latest production with a maximum moisture content did not in any way vary the terms of the written contract.

■ 3. Assuming only for the purpose of this commentary that the designation of No. 2 Yellow shell corn referred indiscriminately to old and new corn, yet in the subsequent negotiations of the parties it appeared conclusively that the defendants were demanding new corn to fulfill the contract and that the plaintiff acquiesced in the demand. It is elementary that a written contract may, in the absence of statutory provisions requiring a writing, be modified by a subsequent oral agreement. 17 C.J.S., Contracts, § 377, p. 865, Crown Central Petroleum Corporation v. Consolidated Oil Co., 5 Cir., 85 F.2d 429, loc.cit. 434.

In view of the above it must follow that the plaintiff is not entitled to recover on the first count of his complaint.

■ 4. On the second count the plaintiff seeks recovery, as above stated, of the purchase price of a load of corn delivered to the defendants on March 16, 1948. The amount of this purchase with protest fees is $1,023.03. Without any reasonable question the defendants employed this transaction as a ruse to collect the $1,000 deposited as earnest money on the contract of November 25, 1947. It was the duty of the plaintiff, of course, since he could not meet the terms of the contract, to refund the $1,000. It was not in accordance with approved business practice or open dealing for the defendants to use this method to collect the amount of the deposit. Although the defendants say the corn did not come up to specifications, nevertheless delivery was made to them under circumstances which indicate that they were not interested in inspecting the corn. They were endeavoring to collect a debt or to recover a deposit. The plaintiff should have judg-

ment on that count for $123.03 with interest at 6% from March 16, 1948.

■ 5. In the matter of the defendants' counterclaim: The defendants were familiar with the difficulties they were experiencing in procuring delivery of the corn from the plaintiff. According to their testimony the corn contracted for constituted less than a major part of their annual transactions. They apprehended their problem in securing delivery and they made purchases elsewhere to supply much of their needs. They did not point to a single customer to whom they failed to furnish seed corn. Moreover, they were able to procure corn at a much less price than that contracted from the plaintiff. At the time they employed the ruse to collect their $1,000 deposit above mentioned, they advised the plaintiff to "forget the whole transaction." They were not then claiming damages for plaintiff's failure to comply with his contract, nor did they at any time urge damages until the plaintiff had instituted this action. They were not entitled to recover on their counterclaim and the issue should be found against them.